Good morning, all. Judge Mannion and I are privileged to have sitting with us today by designation Judge Alonzo of the Northern District of Illinois. And we welcome him, of course, and are fortunate that he's available to help. Our first case for argument this morning is Bell v. Taylor, Mr. Bell. Thank you very much, Your Honor. May it please the court, I'd like to reserve five minutes for rebuttal. This is a joint appeal that concerns copyright infringements of two photos that I took and I later registered with the US Copyright Office. I will refer to the two photos as daytime and nighttime. Both are photographs taken from virtually the same place, showing the skyline of Indianapolis, Indiana, overlooking the canal. As the copyright owner, I filed suit against defendants Cheatham and O'Brien because they posted the daytime photo on their commercial websites without my authorization. I also filed suit against Taylor for displaying the nighttime photo also on his commercial website without my authorization. Let me take the daytime case first. Let me address the rulings that I believe are in error that need to be corrected by this court as it relates to the daytime photo. Each of the defendants filed a motion for summary judgment. To oppose that summary judgment on the issue of damages, I designated an affidavit that I filed based on my personal knowledge that for years I have sold the photo for $200. In addition to that, I- These are long before you were- when did you get the cert- whatever you filed for, not a certification, but when did you get a copyright or whatever it was? Well, in photographs, the copyright is instantaneous as pun. Clicking it and then registering it with- That's what I mean. And in August of 2011, I attached to the exhibit the list price. Now, the list price is off my website, richbellphotos.com. And so that was an additional exhibit to my affidavit. The district court granted summary judgment to the defendants as to damages, and this is what the court stated. Here, there is no evidence other than Mr. Bell's unsupported assertion that he has sold the rights to the Indianapolis photo for years at a price of $200. Without the support or evidence, this value is based on undue speculation. Well, the court is clearly wrong. The court did not follow the 1985 decision of this court in Deltek versus Advanced Systems. In Deltek, the party stipulated that the list price of- and here, both myself and the defendants attached virtually the same exhibit showing the list price of $200. So it's almost like a stipulation. Well, not quite. It's just a recognition that that's what the website states, Mr. Bell. That's correct. And here's what Judge Posner said on that issue. Judge Posner said, while not conclusive, quote- You're talking about- In Deltek. When did he say this? In 19- Are you talking about an opinion? Yes. OK, that's an opinion. I'm sorry. In his opinion, he stated- Court's opinion. Court's opinion, I'm sorry. The list price is evidence of fair market value, end of quote. And if the infringers disagree, this is not a quote, but he said down in a later quote, the burden of persuasion, both as to the showing of fair market value, less than the stipulated list price, falls, of course, on the infringer. In this case, the infringers never offered any evidence whatsoever. Mr. Bell, did they seek in any way to establish what sales of the photo had occurred? Yes. And what was the result of that inquiry? The motion for summary judgment was done before those documents were available to the defendant. It turned out that I wanted a protective order, and they were not willing to give me a protective order to keep the information out about bank accounts and things of that nature, and they weren't willing to give that to me. Without that information, how would they be able to establish whether or not that's the accurate price? I told them what the price was. Well, I understand. I understand. And they challenged that in the sense that they're saying there's no support other than the affidavit and the website. Well, that's correct. All right. They could have filed a 56-D motion and asked for that information before they filed their summary judgment, but they didn't. You said you had a whole lot of sales. Yes. And that goes way back before. Oh, absolutely. OK, and so what did you have, advertisements of? Or how did people find your photograph in order to buy it? First, through Web Shots, which is out there. And I had a notation that you could buy it. In fact, that's where several people contacted me and bought the photograph. And what did they do with it? They put it on their website. For example, Community Hospital uses it. That's an example of a sale that took place. Yeah, that's right. An example of a sale that was made. Before the lawsuits and all that. Oh, yeah. Clearly before the lawsuit. In fact, I think the date that they acquired it was in the early 2000, about 2005. And when did you take the pictures? 2000. So you had about a five-year period of time when no sales? No, I didn't have any sales during the first five years. Community Hospital was the first organization that bought it. Was there any other? I didn't see anything in the record that we have that where the various people that you sued got their photo. Actually, that's been a mystery. Well, it is. It's a mystery. And where'd they get it? As soon as you let them know that you had a copyright or whatever you want to call it, that they took it off their website, right? That's correct. The other error that the court made as it relates to the daytime photo is the ruling on the declaratory judgment. Now, there's a very similar case called on Davis versus the gap, where the court said in the Second Circuit, the owner of copyright is entitled to prevail in a claim for declaratory judgment of infringement without the showing of entitlement of monetary relief. I should be allowed to receive a declaratory judgment that I'm the owner of that photograph. And because that's essentially what I asked the court to do in the first place. What would that achieve? That'll make sure that additional folks that there's over 500 people that have copied my photograph. 500 people? 500 people. How many have you sued? About 150. How many have paid? Virtually everybody. They paid, what, $200 in lieu of the lawsuit? No, they pay a lot more than that. Really? Yeah. Why? Why? Simply because it's an infringement. Oh, but this is a penalty in addition to the cost. Correct. What's the most you've ever got? I do have confidentiality agreements with those, but since you asked, you're on. I don't need to know who, just how much. OK, $7,000. $7,000? $7,000. Wow. I reserve the rest of my time for rebuttal. Thank you, Mr. Bell. Mr. Nelson. May it please the court, my name's John Nelson for the appellees in this matter. In the 2013 case, the district court dismissed all of Mr. Bell's claims against Cameron Taylor and Taylor Computer Solutions with prejudice. This was every one of his claims. This ruling typically is entitled to full race judicata effect. And this case, pre-remand, there was a determination that there had not been a final judgment. But for purposes of Mr. Taylor, the portion of the summary judgment ruling that was issued in August of 2014 as to Mr. Taylor was final. It disposed of all those claims with prejudice. And effectively, the court disassociated itself with the case against Mr. Taylor. The fact that there may have been some housekeeping or some leftover matters relating to the declaratory judgment aspect of this case that still needed to be adjudicated as to the other two defendants does not change the fact that, as to Mr. Taylor, he was done with it. After the remand, the determination with respect to him remained the same. And that's why I cited the Gil Boehm case, which, similar to this case, deals with a case where you have multiple claims and multiple parties. And basically, what the court said there with respect to one of the claims that they were able to dispose prior to disposition of the entire case was that the dismissal of the claim was not interlocutory in nature. Therefore, that portion of the summary judgment ruling, dismissing all of Mr. Bell's claims against Mr. Taylor with prejudice, should be entitled to full race judicata effect. Irrespective of that, going forward, this court will make a determination. It will issue a ruling in the event that that ruling affirms the 2013 case as to Mr. Taylor, then clearly, I think, beyond question, you've got a final judgment which is beyond dispute, which satisfies, more than satisfies, I believe, the final judgment element of race judicata. Mr. Bell has basically acknowledged that the privities, the identity of privies parties element has been met. The third element of that, identity of the cause of action, as he noted, there are two different photographs in issue which would naturally, I think, say there are two claims. But the claim that relates to Mr. Taylor, specifically the nighttime photo claim, is based on materials that I presented to the court, the quintessential claim which should have been brought within the meaning of Cypress Hill and the cases that discuss those kinds of claims that should have been brought in a prior litigation, but for whatever reason were not. In this case, Mr. Bell was provided with not just one or two things, but a number of items which put him on notice at a very early point in the proceeding before he ever filed his first case against anybody for all these copyright violations. Mr. Taylor sent him an email that specifically says, Indianapolis skyline at night. The fact that Mr. Bell is claiming ignorance or surprise, I don't know if he didn't review these materials or what, but in addition, Mr. Taylor provided a copy of the nighttime photo itself prior to the deadline for the motion to file motions for leave to amend. In short, he had plenty of opportunity to amend the complaint to include this nighttime photograph. And the other thing that I did point out in my surreply was that the nighttime photograph was included in the same batch of photos as the daytime photograph submitted to the US Copyright Office at the same time and assigned the same registration number. I think just the fact that all these facts, I think, point squarely to the notion that this is a claim that should have been brought. And again, in the- What was the demand as far as to your clients to pay or get sued? Did your clients get a demand for paying a certain amount for using the photographs? My clients were contacted out of the blue by Mr. Bell. Out of the blue. How much? I'm thinking the initial demand may have been $500, and this would have been in 2011. And I know this would have been in spring of 2011. At that time, I believe each one of them asked him what proof he had that he owned the photograph. We have affidavits that have been presented in the case that he refused to answer those questions and basically made comments like, well, the price just went up. Was there a website or something? The website was launched on May 15, 2011, approximately three months prior to the filing of the first lawsuit, which was 111 CV 766 under Judge Pratt. But do you know where your clients got the picture? I'm asking these questions because this comes here with a lot of blank faces, and that's the problem here. One of the clients had gotten a picture off of a website called Cincy Street, which is, I think, a webcam site, and there were no visible indicia of copyright ownership, no watermark, none of the things that you would look towards to see if you're committing a possible copyright violation. That's where Mr. O'Brien obtained the website. Cincy Street? Yes, cincystreet.com. We have to assume they must have paid to get to do that. Or do you know? You wouldn't know. He claims he got it for free off that site. Ms. Cheatham. Well, when you do it, Cincy Street have to pay for it. I imagine Mr. Bill will answer that. As far as, well, that would be speculation as to how they obtained it. Yeah, you don't know. And how they came to post it. The other party, Ms. Cheatham, basically she didn't do anything at all. She had no hands-on involvement with this. She had a website developer that had considerable background designing websites for Century 21, had background vetting different photographs and whatnot to make sure they were in compliance with the copyright rules and copyright laws. And she, again, obtained this from what she described as an open source website. No indicia of ownership, no names, no watermarks, no locks on the photo, nothing from the best determination that she could make. I mean, she could not ascertain the owner. And the problem at that time was that in the spring of 2011, well, actually, when Cheatham, via her website designer, obtained the photograph, it was approximately 2007. And at that point in time, there had been no registration of the daytime photograph. So the problem is when Mr. Bell contacts them and says, you owe me money, and he's asked questions as to, well, can you provide some proof of ownership? And he refuses. And then, again, well, does he really own this? And if you were to look at the US Copyright Office, you wouldn't see anything, because he hadn't registered the photograph yet. So that's, I mean, from a policy standpoint, I mean, we always talk about encouragement of early registration of copyrighted materials. Here, there was an 11-year time gap between the 2000, the date he claimed to take the picture in 2000, and the date of registration, which was in August of 2011. On top of all this, there's some questions that I think raise kind of a, when he says he's entitled to a certificate of a declaratory judgment, because he's the owner, again, he's asking for what is essentially an equitable remedy. Now, when you have facts such as what I've just stated about his refusal to basically come clean, or at least illuminate them on how he does own the, how he came to own the copyright, on top of this, we did find out that, I mean, he makes a sworn statement saying he took the picture in the year of 2000 with a camera that our website developer later found out was not invented until 2005, that the picture was first posted on a website of a law firm that Mr. Bell used to work for back in 2000. There are a number of factual things, and one of the other factual items that we had requested with respect to shedding light on the ownership issue is the exit metadata, which for digital cameras nowadays is embedded information similar to a- Is there anything in the record that shows what his ownership was at the time your clients, I will say, used the photograph? And I'm trying to find out what they should have known if they had just looked. At the time, Ms. Cheatham commenced publication in 2007, terminated one week after the filing of the first lawsuit, and registration did not occur for another two months. I want to know if there's anything in the record that shows how your client should have known he took the picture. There's nothing that I can identify that- Well, you got it from CINCI or something, one of your clients did. Is there a way that they should have known it wasn't just whatever they call it when everybody's using the picture? To say that from the basis of the websites that they did obtain the picture from, that it would have put them on sufficient notice to know that Mr. Bell published it, there's no indicators along those lines that would have been very problematic to determine that. Well, somebody five years after he took the picture paid $7,000 to use it. How would they have found out he took the picture? Or do you know? I don't know. Well, they were attempting to find out how he took the picture, but he wouldn't tell them. Before you knew who Mr. Bell was, before he contacted your clients, where did they get the picture? Was there any way they should have known that it was his picture and they shouldn't have used it? There was no way they could have known. Well, maybe we'll hear Mr. Bell's. With respect to the issue of actual damages, I see my time is up. You may make a concluding remark about the damages, Mr. Nelson. OK. The specificity rule contained in Federal Rule 56, the district court in enforcing that, knowing what it knew about not only this case, but the other numerous cases involving Mr. Bell, was, I think, well within its purview in enforcing this to the degree that it did. What we have is the problem from a policy standpoint is where a conclusory, take my word for it, statement that is devoid of any factual particulars is basically accepted sight unseen. It becomes then akin to a schoolyard boast where a kid says, yeah, I've hit a lot of home runs. OK, name one. Who'd you hit it off of? Who was the pitcher? What team were you playing for? Same thing here. OK, I've sold photos. To who? Name one. There is not, throughout all of this, in the five years I've been involved in this case, I have yet to see the name of one person that is willingly, willingly, not with, as a result of a settlement demand of $7,000 or $5,000 or whatever it's been, willingly, on his own volition, buy this picture without the threat of litigation hanging over their head. And that's why I feel that. All right, thank you, Mr. Nelson. Thank you, Your Honor. Mr. Bell. Mr. Bell, has all this litigation occurred before a single district judge? All your cases? No, no. But virtually, this is the only one where a decision has been rendered. All the rest of them have been settled. I see. Thank you. Let me address his last point that he made, that I have not sold it to willing buyers and willing sellers. That is absolutely false. Well, how do we know? What in the record tells us that? Well, let me say this. I, in another case, presented all the sales whatsoever. And I believe that counsel has actually had communication with the other lawyer involved in that case to find out what the sales were. After his clients were using it? Pardon? After his clients were using them, the photos, he contacted another lawyer? Yes. All right, so you already knew there was litigation on it. I'm trying to find that out why. So go on. I don't want to interrupt you. Just finish up here. The person that he contacted is a case that I filed a few months later than his. OK, so he didn't know. He didn't know about the litigation. There was other litigation. All right. OK. How should he have known? How should his client have known it was your picture? Well, Your Honor, let me say this. You're not allowed to put somebody else's photograph on your website, and at the bottom of the page, put your copyright notice on there. That's exactly what they did. That is the violation. So they copyrighted your photo? Exactly. OK, I didn't see that part. Well, it's right in the, I'm sorry. Is that a part of the litigation? No, as it turns out, when they eliminated that page with my photograph on it, it's not in the record at this point in time. But that is exactly what happened. They, every single one of these cases, they put the photograph on there, and the website designers, the website, the organizations that host these websites require that you put a copyright notice on the bottom of each page. So that's what they did. They copyrighted my photograph. Now, that just seems like a different case for some reason. Huh? You know, we were arguing over if somebody stole your, by copyrighting your case, your picture. Right. Well, let me address the issue of race judicata. We don't have a lot of time, but you may have a couple minutes to do that. OK. First of all, there are three reasons why the race judicata does not apply to this case, to the 2014 case. First of all, the case is under appeal, so there was no final decision. So we should send that case back, I guess, is what you're suggesting. Yes. The second case, well, I think the better thing to do would be to allow me to amend the complaint in the 2013. No, you don't amend it up here. I understand, but with instructions to amend it in the 2013 case, and then dismiss the 2014 case, that would solve the whole thing. But the 2012 case also did not make a determination whatsoever on the nighttime photo. And thirdly, I was not given a full and fair opportunity to litigate the nighttime photo in the 2013 case. Because you couldn't amend the complaint. Right. Because I asked to amend the complaint, and the judge said no. So thank you very much, Your Honor. Before you go, I need to ask you a question. You mentioned something about, what, 100 cases? Yes. And how many of these sales were as a result of you notifying them that you've got to pay some money or else? Very few. Really? Very few. So as soon as you notified them that you willingly paid? No, they took it down. They took the photograph down and have not published it since. That's 98% of those. Well, did they pay any money? Oh, yes. Well, that's unknown. They paid money. They took it down and paid you some money. Yeah, they took it down and paid me money for the copyright, for the infringement. They used it for months and certainly years without paying for it. They stole it. Well, see, this is where I'm having a problem. They knew they were infringing on your, I don't know about putting the copyright mark on there. That's not part of this. At least I didn't see a long argument about it. You apparently said that was not part of this. That's correct. Okay. All right, I think we have the arguments. Thank you to both counsel. The case is taken under advisory.